# EXHIBIT 1

# EXHIBIT 1
Death Investigation Overview, Synopsis of
Speer interview

cr

**SPARKS POLICE DEPARTMENT**
**Death Investigation OVERVIEW**

**Type of Report:**  Death Investigation                  **Case:** 15-9740

**Date/Time of Supplement:** February 10, 2016 / 13:50 Hours        **Detective:** Rowe #115

**Approving Supervisor** ~~TRIPLETT   004~~               **Date:** 2-17-16

**Involved Agencies Case Numbers:**

Sparks Police Department: 15-9740
Reno Police Department: 15-22056
Washoe County Sheriff's Office: 15-8992
Washoe County Medical Examiner: 15-2925

**Investigating Detectives:**

SPD Detective ROWE
SPD Detective GALLOP
SPD Detective PETERSON
SPD Detective CURTIS
SPD Sergeant ALT
SPD Lieutenant TRIPLETT
WCSO Detective NEMETH
WCSO Detective ANDREWS
WCSO Lieutenant GREEN

**Officers / Deputies Involved**

RPD Officer MAXWELL
RPD Officer APARICIO
RPD Officer TALLMAN
RPD Officer GOOD
RPD Sergeant STEFENS
WCSO Deputy HUBBELL

1



Case #15-9740
Detective Rowe #115

WCSO Deputy EVANS
WCSO Deputy WILLIAMS
WCSO Deputy SENGER
WCSO Deputy GLYNN
WCSO Deputy CARLSEN
WCSO Deputy BIRD
WCSO Sergeant WESTERLIND

**Suspect:**

N/A

**Synopsis:**

On October 4, 2015, at approximately 02:10 hours, the Reno Police Department received a report of a subject, later identified as Thomas PURDY, who had been arrested for trespassing at the Peppermill, 2707 S. Virginia Street in Reno. Reno Police Department Officers MAXWELL, APARICIO and TALLMAN responded to the Peppermill and met with Peppermill security. Officer MAXWELL was the first to arrive on scene and learned that PURDY was uncooperative with Peppermill security and had kicked at security officers. Officer MAXWELL observed approximately five security officers around PURDY who was face down on the ground and in handcuffs. Officers MAXWELL and APARICIO escorted PURDY to their patrol vehicles and attempted to remove the security handcuffs. PURDY continually ignored the officer's instructions and at one point attempted to kick Officer MAXWELL. PURDY was laid on the ground by Officer MAXWELL and Officer TALLMAN and placed into RIPP Restraints. After being placed into RIPP Restraints, PURDY continued to try and escape from the restraints by pulling them down from his ankles.

Officer MAXWELL transported PURDY in a marked Reno Police Department vehicle to the Washoe County Jail. MAXWELL informed Washoe County Jail staff that PURDY was uncooperative and that he needed assistance. While in the back of MAXWELL'S vehicle, PURDY removed one of his feet from the RIPP Restraints and had his foot on the ceiling of the patrol vehicle. Officer MAXWELL and Officer GOOD, who was at the jail, removed PURDY from the patrol vehicle in order to re-apply the RIPP Restraint. Washoe County Sheriff Deputies HUBBEL, SENGER and Sgt. WESTERLIND met with Officers MAXWELL and GOOD in the parking lot and moved PURDY into the jail facility via a Mega-Mover transporter.

*It's important to note that Officer MAXWELL reported that PURDY repeatedly made "odd statements" during his contact with Mr. PURDY.*

SPARKSPD-2/23/2016-0255

Case #15-9740
Detective Rowe #115

Once inside of the intake portion of the Washoe County Jail, PURDY continued to be uncooperative with law enforcement. PURDY ignored verbal instructions to relax so that the RIPP Restraint could be removed. Deputies HUBBEL, GLYNN, SILVA, CARLSEN, SENGER and Sgt. WESTERLIND observed PURDY fight against the restraints and make statements that Sgt. WESTRLIN described as "signs of paranoia."

Washoe County Jail Medical Staff met with PURDY in the intake portion of the Washoe County Jail. Medical staff including Jackie CHAPMAN, Michael BUEHLER and Piyasa VIRIYAKUL all noted that PURDY entered the detention facility yelling and screaming. CHAPMAN noted that PURDY was not in respiratory distress. VIRIYAKUL reported that PURDY was fighting the restraints and screaming when she first encountered him. VIRIYAKUL noted that PURDY complained of respiratory issues due to a lung surgery. VIRIYAKUL stated that she attempted to obtain further information about the surgery but PURDY refused to answer her questions. VIRIYAKUL noted that PURDY stated that he couldn't breathe but VIRIYAKUL did not observe any respiratory issues. VIRYAKUL was unable to obtain PURDY'S blood pressure due to PURDY fighting the deputies and the restraints. VIRYAKUL was able to obtain PURDY'S pulse and VIRIYAKUL stated that PURDY'S pulse was "not alarming due to inmate actively resisting and moving his body." VIRYAKUL stated that she allowed PURDY into the detention facility "due to absence of obvious life threatening signs."

PURDY was moved into a holding cell by Deputies HUBBEL, GLYNN and SILVA. Once inside of the holding cell, PURDY continued to fight against the restraints. Deputy HUBBEL noted that PURDY was "struggling so hard that it was moving himself and the deputies across the floor and toward the entry way of the cell." Eventually the restraints were removed from PURDY and deputies left the holding cell. Sgt. WESTERLIND maintained visual of PURDY inside of the cell. Sgt. WESTERLIND observed that PURDY wasn't moving so he directed deputies to re-enter the holding cell. After the deputies re-entered the cell, they found PURDY in medical distress. Medical staff was called to the scene and lifesaving efforts began. REMSA paramedics met with Washoe County Jail Medical Staff and transported PURDY to Renown Medical Center. PURDY remained at Renown Medical Center on life support until October 8, 2015 at 12:05 hours when PURDY died.

The Washoe County Sheriff's Office contacted the Sparks Police Department on October 7, 2015 and asked the Sparks Police Department to conduct the investigation.

3

Case #15-9740
Detective Rowe #115

**<u>Description of Key Video Evidence:</u>**

Video surveillance footage was received from the Peppermill Casino, the Washoe County Jail central control and a hand held video camera that was operated by Deputy BIRD at the Washoe County Jail.

*All times listed are approximate. It's also important to note that some of the time stamps on the video are not accurate.*

*The sequence listed below is listed in order of events and not necessarily time. It is taken from several different camera views.*

*Times listed in bold appear to be approximately 3 minutes fast.*

**Peppermill Video:**

10/04/15 at 02:10 hours – PURDY is sitting on the floor between two slot machines and speaking with Peppermill security.

10/04/15 at 02:12 hours – PURDY is escorted out of the casino by security. PURDY can be seen pulling away from a security employee's grasp.

10/04/15 at 02:13 hours – PURDY is sitting on a bench in the valet area. PURDY stands and moves through parked vehicles.

10/04/15 at 02:14 hours – Security officers approach PURDY in the valet area and PURDY appears to attempt to hide. PURDY is escorted by security officers to Virginia St.

10/04/15 at **02:22** hours – A group of security officers and PURDY walk into camera view and stand next to a set of stairs near Virginia St.

10/04/15 at **02:27** hours – A group of security officers appear to be in a struggle with a person on the ground.

10/04/15 at **02:27** hours – The first Reno Police Officer arrives on scene.

10/04/15 at **02:28** hours – A Reno Police Officer meets with security.

10/04/15 at **02:29** hours – The Reno Police Officer meets with PURDY.

10/04/15 at 02:26 hours – PURDY is escorted by Reno Police Officers on the sidewalk near Virginia

4

SPARKSPD-2/23/2016-0257

Case #15-9740
Detective Rowe #115

                  St. While at Reno Police patrol vehicles, PURDY is taken to the ground by
                  Reno Police Officers.

10/04/15 at **02:44** hours – Reno Police Officers move onto a sidewalk and lay PURDY down.

10/04/15 at **02:45** hours – Two Reno Police Officers carry PURDY to a police vehicle.

10/04/15 at 02:46 hours – PURDY is driven away in a Reno Police patrol vehicle.

**Washoe County Jail Central Control Video:**

10/04/15 at 02:58 hours – Reno Police Officers contact PURDY in the back seat of a Reno Patrol
                  vehicle.

10/04/15 at 03:00 hours – PURDY is removed from the rear of the patrol vehicle and laid on the
                  ground.

10/04/15 at 03:07 hours – PURDY is moved inside of the Washoe County Jail.

10/04/15 at 03:16 hours – PURDY is moved out of intake.

10/04/15 at 03:17 hours – PURDY is moved into the holding cell.

10/04/15 at 03:20 hours – Deputies leave PURDY alone in the holding cell.

10/04/15 at 03:22 hours – Deputies and medical personnel go back into PURDY'S holding cell.

10/04/15 at 03:30 hours – REMSA paramedics arrive.

10/04/15 at 03:42 hours – PURDY is moved by REMSA.

**Washoe County Sheriff Hand Held Video Recording:**

*This video did not have any time stamps.*

Part one of the handheld video shows PURDY in intake at the Washoe County Jail. PURDY is
speaking with jail deputies and repeatedly says "don't do this." PURDY tells the deputies that a gun
is in his pants. During the contact, medical personnel ask PURDY if he has any medical problems
and PURDY says that he had lung surgery and that he wants an ambulance. Medical personnel ask
PURDY why he needs an ambulance and PURDY stated that he couldn't breathe. At this point in the

5

SPARKSPD-2/23/2016-0258

Case #15-9740
Detective Rowe #115

video, PURDY appeared to be breathing normally.

Medical personnel ask PURDY if they can listen to his lungs and PURDY told medical staff "no."
PURDY asks again to go to the hospital and tells medical personnel that he can't breathe. During the
contact, deputies repeatedly tell PURDY to relax and deputies attempt to take the leg restraints off.
PURDY does not comply.

The flooring in the intake portion of the Washoe County Jail is black in color. Eventually, PURDY is
moved from the intake portion into a holding cell. After PURDY is moved, you can clearly see a
large wet spot on the floor (presumably sweat) where PURDY was lying.

PURDY is carried to a holding cell and as deputies move him through the jail PURDY yells "their
gonna kill me." Once in the cell, PURDY is again told to relax his legs and PURDY still does not
comply. Throughout the contact with jail deputies, PURDY is repeatedly asked and told to relax so
that jail deputies could remove the leg restraints. Eventually the leg restraints are removed and the
deputies leave PURDY'S cell.

Part two of the video shows deputies re-entering PURDY'S cell and PURDY is unresponsive on the
ground. When deputies contact PURDY, a deputy is heard saying that PURDY is breathing. A short
time later, medical personnel arrive and asses PURDY. During the medical assessment, a deputy can
be heard saying that PURDY is "slowly waking up so be ready." A Sergeant calls for additional
medical assistance. During medical aid, medical personnel can be heard saying that PURDY had a
pulse and a deputy can be heard saying that PURDY is barely breathing. Medical personnel request
for REMSA paramedics to be called and a Sergeant immediately requests REMSA over his radio.

Medical personnel say again that PURDY is breathing and that he has a pulse. During treatment,
medical personnel say that they lose a pulse and begin CPR. PURDY is moved from the cell and
medical personnel and deputies continue CPR. During CPR, medical personnel report that they get a
pulse on PURDY.

Part three of the video shows PURDY being taken from the jail by REMSA.

**<u>Synopsis of Key Officer Involved Statements:</u>**

*The following are summaries of the interviews. They are not meant to be verbatim and not meant to
be transcripts of the interviews. For specific details of the interview please see the interview
transcript and/or DVD recordings of the interview.*

SPARKSPD-2/23/2016-0259

Case #15-9740
Detective Rowe #115

**Reno Police Officer MAXWELL:**

Officer MAXWELL responded to the Peppermill, 2707 S. Virginia St., to a report of a male in custody for trespassing. The call indicated that Peppermill security was with the male, Thomas PURDY, in the valet area and that PURDY was creating a disturbance.

When Officer MAXWELL arrived on scene, he was hailed by security officers and directed near the southeast corner of the building. MAXWELL observed PURDY lying on the ground face down in handcuffs with approximately five security officers near him. Security informed MAXWELL that PURDY had been trespassed but kept returning to the property. Security also informed MAXWELL that PURDY was kicking at them and was uncooperative.

MAXWELL attempted to speak with PURDY and tell him to calm down but PURDY did not acknowledge MAXWELL'S presence.

MAXWELL and Officer APARICIO escorted PURDY to the patrol vehicles to facilitate switching handcuffs. MAXWELL gave PURDY instructions to separate his feet but PURDY ignored the order. PURDY moved several times making it difficult for MAXWELL and APARICIO to remove the handcuffs. MAXWELL told PURDY to hold still and PURDY again ignored the order. During this time, PURDY attempted to kick Officer MAXWELL. MAXWELL and Officer TALLMAN took PURDY to the ground. Officer MAXWELL wrote "While Thomas was on the ground, face-down, he continued to be combative with us by rolling back and forth, extending his legs, and grabbing at our hands while we attempted to apply the RIPP Restraints." After the restraints were applied PURDY continued to try and escape them by pulling the restraints down from his ankles.

MAXWELL noted that PURDY made several statements that were out of the ordinary. MAXWELL heard PURDY offer the officers ten thousand dollars to let him go. MAXWELL stated "much of what he said did not make any sense."

MAXWELL called for the transport unit but learned that the unit was busy at the Washoe County Jail. MAXWELL contacted Sgt. STEFFENS and informed Sgt. STEFFENS that they had applied the RIPP Restraints to PURDY and that the transport unit was busy. Sgt. STEFFENS instructed MAXWELL to have an additional officer follow him to the jail. That officer was Officer APARICIO.

MAXWELL transported PURDY in the rear of his marked patrol vehicle. MAXWELL noted that because the seat belt would be positioned near PURDY'S neck he decided to leave PURDY'S seat belt off during transport.

When MAXWELL arrived at the Washoe County Jail he informed jail staff that PURDY was

7

Case #15-9740
Detective Rowe #115

uncooperative and that he needed assistance. While waiting in the parking lot, MAXWELL opened the rear door of his vehicle to check on PURDY. MAXWELL noticed that PURDY had slipped one of his feet out of the RIPP Restraint and had his foot on the ceiling of his patrol vehicle. MAXWELL stated that Officer GOOD arrived at his location. Officer MAXWELL made the decision to move PURDY out of the patrol vehicle due to PURDY'S positioning and to re-apply the RIPP Restraint.

MAXWELL stated that once PURDY was out of the vehicle he "was still very combative and uncooperative while we re-applied the RIPP Restraints. He was soaked in his own sweat and smelt badly of body odor. He was still conscious and making odd statements."

MAXWELL noted that after PURDY was booked into the Washoe County Jail, he cleaned the rear of his patrol vehicle with Clorox wipes. MAXWELL stated that he did this because "Thomas had a bad odor and there was a lot of sweat in the back seat."

**Reno Police Officer APARICIO:**

Officer APARICIO responded to the Peppermill to an in custody call for service. When APARICIO arrived on scene, he met with security officers Russel SMITH and Andrew MILLER who told him that PURDY had been detained for trespassing.

APARICIO arrested PURDY for the charge of trespassing and completed an arrest report and declaration of probable cause.

APARICIO and Officer MAXWELL escorted PURDY to the patrol vehicles to remove the security handcuffs that were on PURDY. APARICIO stated that PURDY became combative and began kicking his legs back towards Officer MAXWELL. APARICIO stated that Officer TALLMAN arrived on scene and assisted with placing PURDY on the ground and getting him into RIPP Restraints. APARICIO stated that he placed the RIPP Restraints onto PURDY'S feet and "tethered them to PURDY'S handcuffs."

APARICIO stated that he followed Officer MAXWELL when MAXWELL transported PURDY to the Washoe County Jail.

**Reno Police Officer TALLMAN:**

Officer TALLMAN responded to the Peppermill for a male in custody for trespassing. TALLMAN stated that Officers APARICIO and MAXWELL were already on scene. As TALLMAN approached the other officers he could see that APARICIO and MAXWELL had PURDY detained against APARICIO'S vehicle. TALLMAN noticed that PURDY was "being combative and resisting officers. He was pushing back towards the officers forcing his way off of APARICIO'S vehicle

8

Case #15-9740
Detective Rowe #115

while attempting to raise his legs."

TALLMAN grabbed PURDY'S left arm in an attempt to control him. TALLMAN stated "as I did this he again attempted to bring his legs upward trying to kick Officer MAXWELL so we took him to the ground between two parked patrol vehicles."

TALLMAN stated that once PURDY was on the ground the officers applied the RIPP Restraints to PURDY'S feet. TALLMAN remained with PURDY while PURDY was on the ground. TALLMAN noted "the defendant continually tried to roll over and pull the RIPP Restraints while he was on the ground. He was also continually yelling at me and security during this time."

TALLMAN assisted with placing PURDY into a patrol vehicle before returning to normal duty.

**Washoe County Sheriff's Deputy HUBBELL:**

On October 4, 2015 Deputy HUBBELL was assigned to intake at the Washoe County Detention Facility. At approximately 03:00 hours, HUBBELL heard a broadcast that the Reno Police Department was bringing in an uncooperative male. HUBBELL left the "Sallyport", which is another term for the intake portion of the jail, and met with officers in the parking lot. When HUBBEL first observed PURDY he was handcuffed, in RIPP Restraints and lying on a Mega-Mover. HUBBEL describes the Mega-Mover as a "tarp like device used to carry inmates who are restrained." HUBBELL noted that PURDY was "shouting and arching his back, kicking his legs down and pulling his arms up." HUBBELL heard a Reno Officer telling PURDY to calm down and not attempt to free himself from the restraints.

HUBBELL along with several other deputies carried PURDY in the Mega-Mover into the intake portion of the jail. HUBBELL stated that as they were carrying PURDY he "continued to thrust his legs down and his arms back and he was shouting. PURDY was shouting that the officer had planted a gun on him and that the officers were going to kill him because of the planted gun."

HUBBELL conducted a search of PURDY and did not locate any firearm. HUBBELL spoke with Deputy SENGER who also stated that he had searched PURDY and did not locate any firearm. HUBBELL stated that PURDY continued to insist that he had a gun on him. HUBBELL stated that during the search of PURDY and while he was being screened by medical staff, PURDY continually thrust his legs down and his arms up with "great force." HUBBELL stated that PURDY'S actions stretched the nylon restraint and placed enough force on the clip that it could not be removed. HUBBELL stated that medical staff attempted to screen PURDY but he would not answer their questions. HUBBELL stated that during the attempted screening medical staff confirmed with him that PURDY'S eyes "were dilated to the point that they believed he was under the influence of narcotics."

9

Case #15-9740
Detective Rowe #115

HUBBELL attempted to speak with PURDY and asked him to calm down. HUBBELL stated the he attempted to inform PURDY that he was trying to take the restraints off and make things more comfortable for him. HUBBELL stated "each time we attempted to remove the nylon restraints PURDY would struggle against us, making it impossible for us to unclip the restraint." HUBBELL also stated "We were continually unable to overcome PURDY'S strength."

HUBBELL along with Deputies SENGER, SILVA and GLYNN moved PURDY into a holding cell. HUBBELL stated that PURDY continued to yell and scream as they were moving him. HUBBELL stated "It should be of note that I have seen men nearly double PURDY'S size and in good physical condition who were unable to struggle as effectively while hobbled as PURDY had been during the entire transporting and searching process."

After moving PURDY into the holding cell, PURDY continued to struggle against the restraints. HUBBELL noted that PURDY was "struggling so hard that it was moving himself and the deputies across the floor and toward the entry way of the cell." Eventually the restraints were removed and PURDY stopped shouting but continued to resist. HUBBELL looked at PURDY to ensure that PURDY was still breathing and found that he was.

HUBBELL left the cell and stood near Sgt. WESTERLIND. HUBBELL could not see PURDY making any movement so he re-entered the cell with other deputies. HUBBELL rubbed PURDY'S chest and PURDY "quietly groaned." When PURDY'S condition worsened HUBBELL assisted medical staff with life saving measures.

**Washoe County Sheriff's Deputy GLYNN:**

On October 4, 2015, Deputy GLYNN was assigned to intake at the Washoe County Jail. At approximately 03:17 hours, Thomas PURDY was brought into the intake portion of the jail. GLYNN noted "inmate PURDY was uncooperative prior to being brought into the facility. Inmate PURDY remained uncooperative throughout the entire search of his person by yelling, tensing his body, and physically resisting the deputies as they searched."

After medical staff finished their evaluation of PURDY, GLYNN along with Deputies SENGER, HUBBELL and SILVA attempted to remove PURDY'S restraints. GLYNN stated "inmate PURDY continued to physically resist by flexing and straightening his legs and making it physically impossible to remove the hobbles. Multiple attempts were made to gain some slack in the hobbles in order to remove them, but inmate PURDY'S physical resistance did not allow us to remove them."

GLYNN along with Deputies SENGER, HUBBELL and SILVA carried PURDY into a holding cell using the Mega-Mover. PURDY continued to yell as he was taken to the holding cell. Once inside the holding cell, PURDY continued to resist the deputies' attempts to remove the restraints.

10

SPARKSPD-2/23/2016-0263

Case #15-9740
Detective Rowe #115

Eventually the restraints were removed and GLYNN along with the other deputies left the cell. Sgt. WESTERLIND noticed that PURDY wasn't moving so GLYNN along with other deputies re-entered the cell. When it was determined that PURDY was having a medical emergency medical staff began life saving measures.

**Washoe County Sheriff Sgt. WESTERLIND:**

On October 4, 2015, Sgt. WESTERLIND was assigned at the intake Sergeant at the Washoe County Jail. After hearing the radio broadcast that the Reno Police Department had an uncooperative subject, WESTERLIND met with the Reno Officer in the parking lot.

WESTERLIND observed that Thomas PURDY had been removed from the patrol vehicle and was lying on the ground. WESTERLIND along with other officers moved PURDY into the intake portion of the jail. WESTERLIND observed several deputies who conducted a search of PURDY. WESTERLIND noted that "throughout the search PURDY fought aggressively against the restraints. PURDY exhibited signs of paranoia making statements about officers planting a gun on him and shouting they are going to kill me."

WESTERLIND directed Deputy BIRD to get a handheld video recorder to document the incident.

WESTERLIND was present while EMT VIRIYAKUL conducted a medical screening and concluded that PURDY would be accepted into the facility.

WESTERLIND advised deputies that he wanted the RIPP Restraint removed. WESTERLIND watched as PURDY fought against the deputies and the restraints which made it so the deputies could not remove them. WESTERLIND also noted that "PURDY exhibited great strength" while he was resisting the deputies.

WESTERLIND was present when the deputies moved PURDY into the holding cell. Once PURDY was in the holding cell, WESTERLIND again noted that PURDY had great strength and it took deputies several minutes to remove the restraints.

After the restraints were removed, the deputies left the cell and WESTERLIND watched PURDY through the window. When PURDY did not move or change positions, WESTERLIND ordered deputies to go back into the holding cell. WESTERLIND also requested that medical staff respond to the holding cell. WESTERLIND stated that medical staff requested REMSA and he contacted central control requesting REMSA and declared a medical emergency.

11

Case #15-9740
Detective Rowe #115

<u>**Synopsis of Key Witness Interviews:**</u>

*The following are summaries of the interviews. They are not meant to be verbatim and not meant to be transcripts of the interviews. For specific details of the interview please see the interview transcript and/or DVD recordings of the interview.*

**Kenneth PHILLIPS (Citizen):**

On October 8, 2015, investigators spoke with PHILLIPS at the Riverboat Hotel in Reno.

PHILLIPS acknowledged knowing Thomas PURDY. PHILLIPS also acknowledged that he was with PURDY at the Peppermill on October 3, 2015.

PHILLIPS saw PURDY with a needle in the hotel room. PHILLIPS also stated that PURDY bragged about being able to "slam" (inject) one gram of methamphetamine. PHILLIPS saw PURDY demonstrate paranoid behavior while at the Peppermill.

**Kellie SPEER (Citizen):**

On October 8, 2015, investigators spoke with SPEER at the Riverboat Hotel in Reno.

SPEER acknowledged that she knew PURDY and that she has known PURDY for approximately three months. SPEER also acknowledged that she was with PURDY at the Peppermill on October 3, 2015. SPEER stated that while they were at the Peppermill PURDY was acting paranoid but she felt it was regular for him. SPEER was asked about PURDY'S paranoid comments and SPEER stated that PURDY was talking about people following him.

SPEER stated that she knew that PURDY used methamphetamine.

SPEER stated that PURDY killed himself. SPEER then stated "ok you want to be honest about something, anything happened whatever, that man killed himself." SPEER continued "ok I seen him do drugs, I seen him do a shit load of drugs. Ok, and he shot it up, he filled that needle twice." SPEER stated that PURDY was using methamphetamine.

**Russel SMITH (Peppermill Security):**

SMITH was on duty as a security officer at the Peppermill on October 4, 2015. SMITH and his trainee were on their way to the sports book to do a check when SMITH noticed Andrew MILLER was having issues with a guy who was on the ground "freaking out" in a paranoid state. SMITH stated that he went over to assist MILLER and the guy wouldn't cooperate with MILLER or SMITH.

SPARKSPD-2/23/2016-0265

Case #15-9740
Detective Rowe #115

SMITH advised the man, later identified as Thomas PURDY, that he needed to leave the property. SMITH watched as PURDY did not get up off the floor but instead tried to squeeze in between slot machines.

SMITH stood PURDY up and escorted him towards a nearby emergency exit. As they approached the exit, PURDY tried to run from SMITH. SMITH grabbed PURDY and got him out of the doors. Once outside, SMITH told PURDY to leave the property. SMITH stated that he and the other security officers left PURDY alone at that point.

SMITH stated that he went back inside the casino and was advised by Peppermill dispatch that PURDY was running around outside near the taxis in the valet area. SMITH went outside where he observed PURDY trying to hide behind vehicles in valet. SMITH approached PURDY and again told PURDY to leave the property. Instead of leaving, PURDY tried to crawl underneath a nearby parked vehicle. SMITH pulled PURDY out from under the vehicle and he and another security officer escorted PURDY off the property.

SMITH walked PURDY to Virginia St. and again told PURDY that he had to leave the property. Rather than crossing the street, PURDY began to walk in Virginia St. SMITH observed PURDY suddenly run back onto the Peppermill property towards the marquee. SMITH along with other security officers grabbed PURDY and as they attempted to move PURDY he began to fight. SMITH stated that PURDY "fought us to the bitter end." SMITH also stated "wow, the man was strong."

PURDY was handcuffed and escorted to the stairs near the fountain. SMITH stated that while they were on the stairs, PURDY spoke about people coming to get him. SMITH stated that he asked PURDY who the people were that were coming to get him and PURDY wouldn't tell him. SMITH stated that the Reno Police Department arrived a short time later. SMITH was asked about the Reno Police Officers demeanor when they arrived on scene and SMITH stated "they were calm."

SMITH was asked, based on his experience how he felt Mr. PURDY was acting and SMITH stated that PURDY was "on something". SMITH continued "I've never seen someone act like that before." SMITH was asked to clarify what he meant by "on something" and SMITH stated "cracked out, meth or something."

**Samantha MONTIEL (Peppermill Security):**

MONTIEL stated that she was on duty as a security officer at the Peppermill on October 4, 2015. MONTIEL stated that she heard about a male running back onto the property and that security had him in custody. MONTIEL went to the outside fountain area near Virginia St. where she found the other security officers. MONTIEL stated that when she arrived in the area she observed a male on the stairs with his hands handcuffed behind his back. MONTIEL and the other security officers waited

13

SPARKSPD-2/23/2016-0266

Case #15-9740
Detective Rowe #115

on scene for Reno Police to arrive.

While they were waiting, MONTIEL observed that the male started to "spaz out" or "fidget" and that the male started to make "jerking moves." MONTIEL also stated that the male began to kick at the railing which was on the stairs. MONTIEL watched as security officers moved PURDY to the sidewalk at the bottom of the stairs. MONTIEL stated that after PURDY was on the ground he started kicking again. MONTIEL heard PURDY saying "let me go" and "their gonna shoot me" as PURDY was fighting.

MONTIEL was asked if she had ever dealt with anyone with a mental problem and MONTIEL stated that she had. MONTIEL was asked if she had ever dealt with anyone that was on drugs and MONTIEL stated that she had. MONTIEL was asked if the male was acting like any of the people just mentioned and MONTIEL stated that PURDY was acting "like he was on something." MONTIEL then described PURDY as being paranoid. MONTIEL explained that PURDY talked about people shooting and chasing him. MONTIEL stated that she didn't think PURDY had a mental problem but she did think PURDY was high on something.

**Autopsy:**

On October 9, 2015 at approximately 09:00, hours an autopsy of Thomas PURDY was conducted at the Washoe County Medical Examiner's Office by Dr. KNIGHT. Detectives ROWE and GALLOP were present.

Following the autopsy, Dr. KNIGHT informed investigators that PURDY did not have any obvious signs of significant trauma and no evidence of any injuries that would have led to his death. Full body radiographs of PURDY showed no obvious fractures.

Dr. KNIGHT determined that PURDY'S cause of death was "complications of Excited Delirium" due to "drug (Methamphetamine) intoxication. Dr. KNIGHT also noted other significant conditions as "physical exertion during subdual, and violent struggle under physical restraints while in police custody."

In Dr. KNIGHT'S opinion, she writes "Based on consideration of the circumstances surrounding this death, review of available medical history/records, review of investigative reports and other information, autopsy examination, toxicological analysis, and neuropathologic consultation, the death of Thomas PURDY is ascribed to complications of excited delirium due to drug (methamphetamine) intoxication. Physical exertion during subdual, and violent struggle under physical restraints while in police custody, are significant conditions contributing to death. Based on the circumstances surrounding the death, as currently known, the manner of death is homicide, due to the involvement of others in restraining the decedent."

14

Case #15-9740
Detective Rowe #115

Dr. KNIGHT continues "Homicide as a manner of death (MOD) is a medical determination; it does not imply intent to kill or necessarily any criminal or negligent act, and can be defined simply as death at the hands of another, or death associated with the involvement of others. MOD determination in this case is made particularly difficult by the fact that the decedent's own actions (including illicit stimulant drug use, refusal or inability to cooperate with arrest while intoxicated, and continued violent struggle/exertion) lead to his death. However, the decedent likely would not have died (had cardiopulmonary arrest, leading to death) at this particular time but for the restraint and associated struggle. Therefore, in light of the subdual and restraint applied by others, the MOD is best deemed homicide."

Dr. KNIGHT explained excited delirium as follows: "Excited delirium refers to a syndrome in which an individual dies suddenly during or immediately following a period of agitation and combativeness, which is usually precipitated by the use of illicit stimulant drugs, or psychiatric illness with or without drug use. Autopsy examination in cases of excited delirium does not reveal any anatomic cause of death, such as trauma sufficient to explain the death or immediately lethal natural disease processes. In the majority of excited delirium cases, the terminal event involves medical personnel or law enforcement struggling with the individual to achieve physical restraint for treatment or arrest. During the struggle, or more typically shortly following the struggle, the individual becomes unresponsive and is found to be in cardiopulmonary arrest; even if resuscitated, the individual typically dies due to irreversible brain injury (hypoxic-ischemic encephalppathy)." Later in the explanation Dr. KNIGHT writes "Deaths may occur during initial subdual, during transport, during arrest, during police booking or after being placed in a cell, or during medical evaluation following restraint/struggle."

**Lab Results:**

Dr. KNIGHT submitted PURDY'S blood for testing as part of her medical examination. The results of the blood test showed that PURDY had 98ng/ml of amphetamine and 1900ng/ml of methamphetamine in his blood.

To put the results into perspective, according to Nevada Revised Statute 484C.110 "It is unlawful for any person to drive or be in actual physical control of a vehicle on a highway or on the premises to which the public has access with an amount of a prohibited substance in his or her blood or urine that is equal to or greater than:"

- 100ng/ml (blood) for amphetamine
- 100ng/ml (blood) for methamphetamine

This means that PURDY was nearly considered legally intoxicated under the amphetamine section and was nineteen times over the legal limit of intoxication for methamphetamine.

15

SPARKSPD-2/23/2016-0268

Case #15-9740
Detective Rowe #115

In the NMS Labs report under the methamphetamine section it states "Blood levels of 200-600 ng/ml have been reported in methamphetamine abusers who exhibited violent and irrational behavior. High doses of methamphetamine can also elicit restlessness, confusion, hallucinations, circulatory collapse and convulsions."

## Conclusion:

On October 4, 2015 at approximately 02:10 hours, Thomas PURDY was located by Peppermill Security Officer MILLER on the casino floor of the Peppermill. PURDY was acting paranoid and informed MILLER that people were trying to shoot him. Security Officer SMITH met with MILLER and also noticed that PURDY was "freaking out" in what SMITH described as "a paranoid state." While speaking with PURDY, SMITH told PURDY that he needed to leave the property and PURDY did not comply. Instead, PURDY tried to squeeze himself in between slot machines. SMITH got PURDY off of the ground and began to walk him towards an emergency exit. While walking towards the exit, PURDY attempted to run away from SMITH. SMITH was able to grab PURDY and escort him out of the emergency exit.

Peppermill security officers contacted PURDY again in the valet area of the Peppermill. During the contact, PURDY attempted to hide under a nearby parked vehicle. Security officers pulled PURDY out from under the vehicle and escorted him to South Virginia Street. PURDY was instructed multiple times to leave the Peppermill property.

After PURDY was released by Peppermill security, PURDY attempted to run back onto the Peppermill property. Peppermill security officers stopped PURDY and detained him. During the detention, PURDY began to fight with security officers. Peppermill security officers handcuffed PURDY and moved him to the sidewalk area near the Peppermill fountain in S. Virginia Street.

The Peppermill called the Reno Police Department and requested officers to respond to the scene. At approximately 02:27 hours, while waiting for the Reno Police Department to arrive, PURDY began to struggle with Peppermill security officers. A short time later, Reno Police Officer MAXWELL arrived on scene. Officer MAXWELL observed PURDY lying on the ground face-down in handcuffs with approximately five security officers near him. Security informed MAXWELL that PURDY had been trespassed but kept returning to the property. Security also informed MAXWELL that PURDY was kicking at them and was uncooperative. MAXWELL attempted to speak with PURDY and tell PURDY to calm down but PURDY never acknowledged MAXWELL'S presence.

Reno Police Officer APARICIO arrived on scene after MAXWELL. After speaking with Peppermill security Officer APARICIO arrested PURDY for the charge of trespassing and completed an arrest report and declaration of probable cause.

16

SPARKSPD-2/23/2016-0269

Case #15-9740
Detective Rowe #115

Officer APARICIO and Officer MAXWELL escorted PURDY to the patrol vehicles to attempt to remove the security handcuffs that were on PURDY. As MAXWELL and APARICIO were attempting to swap PURDY'S handcuffs, PURDY attempted to kick Officer MAXWELL. Officer TALLMAN arrived on scene and witnessed PURDY kick towards Officer MAXWELL. PURDY was taken to the ground where he continued to resist officers. Officer APARICIO with the assistance of TALLMAN and MAXWELL placed PURDY into RIPP Restraints. Officer TALLMAN remained with PURDY as MAXWELL and APARICIO completed the on scene investigation. While on the ground, PURDY continually tried to roll over and pull off the RIPP Restraints. PURDY also continually yelled at Officer TALLMAN and Peppermill security officers.

PURDY was placed into the back of Officer MAXWELL'S marked Reno Police vehicle. At 02:46 hours, PURDY was driven from the Peppermill by Officer MAXWELL and transported to the Washoe County Jail.

*It's important to note that the Peppermill had video footage of most of the contact with PURDY during the above mentioned times. The video footage corroborates Peppermill Security and Reno Police Officer's statements.*

When MAXWELL arrived at the Washoe County Jail, he informed jail staff that PURDY was uncooperative and that he needed assistance. While waiting in the parking lot, MAXWELL opened the rear door of his vehicle to check on PURDY. MAXWELL noticed that PURDY had slipped one of his feet out of the RIPP Restraint and had his foot on the ceiling of his patrol vehicle. MAXWELL stated that Reno Police Officer GOOD arrived at his location.  Officer MAXWELL made the decision to move PURDY out of the patrol vehicle due to PURDY'S positioning and to re-apply the RIPP Restraint.

MAXWELL stated that once PURDY was out of the vehicle PURDY "was still very combative and uncooperative while we re-applied the RIPP Restraints. He was soaked in his own sweat and smelt badly of body odor. He was still conscious and making odd statements."

Washoe County Deputies HUBBELL and SENGER along with Washoe County Sergeant WESTERLIND and Reno Officer GOOD carried PURDY into the Washoe County Jail using a Mega-Mover.  Once inside of the intake portion of the Washoe County Jail, PURDY continued to resist deputies and the restraints. PURDY also continued to make paranoid statements about having a gun on him and that people were going to kill him. PURDY'S statements were witnessed by numerous Washoe County Deputies. PURDY aggressively struggled against the deputies who were attempting to remove the RIPP Restraints. Deputy HUBBELL attempted to speak with PURDY and asked PURDY to calm down but PURDY did not comply. Washoe County Sgt. WESTERLIND noted that "PURDY exhibited great strength" while he was resisting the deputies.

17

Case #15-9740
Detective Rowe #115

Washoe County Jail Medical Staff met with PURDY in the intake portion of the Washoe County Jail. Medical staff including Jackie CHAPMAN, Michael BUEHLER and Piyasa VIRIYAKUL all noted that PURDY entered the detention facility yelling and screaming. CHAPMAN noted that PURDY was not in respiratory distress. VIRIYAKUL reported that PURDY was fighting the restraints and screaming when she first encountered him. VIRIYAKUL noted that PURDY complained of respiratory issues due to a lung surgery. VIRIYAKUL stated that she attempted to obtain further information about the surgery but PURDY refused to answer her questions. VIRYAKUL noted that PURDY stated that he couldn't breathe but VIRIYAKUL did not observe any respiratory issues. VIRYAKUL was unable to obtain PURDY'S blood pressure due to PURDY fighting the deputies and the restraints. VIRYAKUL was able to obtain PURDY'S pulse and VIRYAKUL stated that PURDY'S pulse was "not alarming due to inmate actively resisting and moving his body." VIRYAKUL stated that she allowed PURDY into the detention facility "due to absence of obvious life threatening signs."

PURDY was moved into a holding cell by Deputies HUBBEL, GLYNN and SILVA. Once inside of the holding cell PURDY continued to fight against the restraints. Deputy HUBBEL noted that PURDY was "struggling so hard that it was moving himself and the deputies across the floor and toward the entry way of the cell." Deputies held PURDY on the ground in an effort to get him out of restraints. During that time, PURDY was repeatedly told to relax and PURDY can be heard responding to deputies. It took deputies one minute and fifteen seconds to remove the leg restraints from Mr. PURDY and an additional twenty five seconds to remove the hand cuffs. PURDY is held on the ground for a total time of one minute and fifty seconds before deputies leave the cell. Sgt. WESTERLIND maintained visual of PURDY inside of the cell. Sgt. WESTERLIND observed that PURDY wasn't moving so he directed deputies to re-enter the holding cell. After the deputies encountered PURDY it was found that he was in medical distress. Medical staff was called to the scene and lifesaving efforts began. REMSA paramedics met with Washoe County Jail Medical Staff and transported PURDY to Renown Medical Center.

*It's important to note that the Washoe County Jail had video footage from two different camera systems of the entire incident with PURDY. The video footage corroborates the Reno Police Officers and Washoe County Sheriff's Deputies statements.*

PURDY remained at Renown Medical Center on life support until October 8, 2015 at 12:05 hours when PURDY died.

Investigators have reviewed all of the video associated to this investigation several times. A majority of the contact between Mr. PURDY and law enforcement was captured on video. The video does not document any strikes or kicks being done to Mr. PURDY. No portion of the video shows any law enforcement officer using any force outside of a low-level take down and the use of restraints. The officers and deputies involved in this case were not interviewed because their statements are

18

SPARKSPD-2/23/2016-0271

Case #15-9740
Detective Rowe #115

corroborated by the video.

The case was reviewed by investigators and Sparks Police Detective Division Supervision. The totality of the investigation, which includes; video evidence, officer and deputy statements, statements from security personnel, autopsy results and statements of associates of Mr. PURDY, clearly demonstrates no criminal violations were committed against Mr. PURDY by any law enforcement personnel.

During the investigation, Peppermill security officer MONTIEL informed investigators that she had issues with the way that some Peppermill security officers treated PURDY. MONTIEL didn't like the way that PURDY was taken down the stairs and how PURDY was dropped on the ground. MONTIEL also stated that during the incident she wasn't sure how it happened but she heard a "smack" and saw Russel SMITH on top of PURDY.

A video that was provided by the Peppermill depicts SMITH in the holding room at the Peppermill after the incident. At 02:46 hours on the video, a female enters the holding room and SMITH states "you missed your opportunity, this motherfucker boy." The females tells SMITH that she went to lunch and SMITH stated "fuck lunch, this motherfucker was fighting and kicking and shit." SMITH then lowers his voice and looks around the room before saying "he's at the top of the stairs, I pulled his ass down the steps." As SMITH made this statement he pulled his arms backwards demonstrating a tugging motion. The female then walks to a nearby telephone and as the female makes a call SMITH turns away from the camera and makes another comment about his actions as he motions with his right arm. The video stops a short time later.

SMITH was interviewed at the Sparks Police Department and confronted with the video. During the interview SMITH denied pulling PURDY down the stairs. SMITH also denied ever striking PURDY.

The results of the autopsy showed that PURDY did not have any obvious signs of significant trauma and no evidence of any injuries that would correlate to the statements by SMITH. In spite of SMITH's statements, no evidence exists to support a criminal charge against SMITH or any other security personnel.

19

SPARKSPD-2/23/2016-0272